NOT DESIGNATED FOR PUBLICATION

No. 110,504

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ODALIS SHARP,
*Appellant*,

v.

KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; REBECCA W. CROTTY, judge. Opinion filed October 23, 2015. Affirmed.

*Odalis Sharp*, appellant pro se.

*LeAnn M. Cochran*, of Kansas Department for Children and Families, for appellee.

Before HILL, P.J., BUSER, J., and WILLIAM R. MOTT, District Judge, assigned.

*Per Curiam:* A state agency, the Kansas Department for Children and Families, decided that the reports of Odalis Sharp abusing and neglecting her son were "substantiated." In a judicial review of this agency determination, she asked the district court to overturn this finding. The court did not. She now asks us to reverse the district court's denial of relief. We see no reason to do so. We affirm.

1

*One of her children ran away from home.*

On April 9, 2011, C.V. ran away from his family home in Auburn. He hitchhiked to Topeka. He spent the next 2 days at either Wal-Mart or the Topeka Public Library. He slept behind buildings at night. C.V. had no money, so he begged for spare change for food. On April 11, Timothy Sharp, C.V.'s stepfather, reported to law enforcement officers that C.V. was a juvenile runaway.

Shawnee County Sheriff's Deputy Kyle Cochran went to the Sharp residence, where he met with Odalis, as Timothy was at work at the time. Odalis claimed that she believed C.V. ran away because he and Timothy "[did] not get along that great" and C.V. was "struggling with teenager stuff, basically his curiosity." Odalis maintained that she last saw C.V. on the evening of April 8 at approximately 10 p.m. when he came into her room and stated, "'Goodnight. I love you. You're the best.'" She believed C.V. left the property sometime between 5:50 and 6:45 a.m. the following day, as Timothy told her that he saw C.V. that morning. According to Odalis, Timothy then received a phone call from C.V. on April 9 at approximately 5 p.m.; but when Timothy attempted to call the number back, his call connected with a fax machine.

Deputy Cochran filled out a missing person form and a request for assistance and authorization of medical treatment form. As he was doing so, Odalis indicated that she was "very hesitant to sign" the form, as she did not want this information distributed to the media, and she stated "several times she did not believe her son was missing and the 'good Lord knows where he's at and he's fine.'" When Deputy Cochran explained that the form merely allowed law enforcement officers to search for her son who had been missing for 2 days, Odalis finally agreed to sign it.

Officers found C.V. at the Topeka Public Library shortly thereafter. Matthew Johnston, a Shawnee County Sheriff's deputy, drove him home. While in route to C.V.'s

2

residence, C.V. told Deputy Johnston that he would run away again if was returned home and "if he was forced to stay home, he would kill himself by cutting his wrists." Deputy Johnston then asked C.V. about his suicidal comments in an attempt to assess the level of sincerity behind them, and C.V. "continued to be adamant that, if he had to stay home, he was going to kill himself." Deputy Johnston drove instead to the psychiatric department at Stormont-Vail West.

While at Stormont-Vail West, C.V. told Deputy Johnston that he "doesn't really have a normal life," as he cannot watch television, peruse the Internet, or have a cell phone, and he indicated that he did not want to return home because "he is so controlled there that he feels that living out on the street is better." C.V. then told him that as a form of discipline, Odalis had placed him on a bread and water diet for the past 2 weeks. While he acknowledged that Odalis did allow him to eat one meal a day if he behaved himself, he maintained that he had been "primarily on bread and water" except for the few times he was able to sneak food. Significantly, Odalis later confirmed that because C.V. stole a cell phone and incurred "outrageous phone bills" for calls and Internet usage related to pornography, she limited his food consumption to bread and water and one meal of his choosing; an idea she obtained from an encyclopedia which indicated that in the early 1900's the prison system fed inmates this diet.

Sterling Hunter, a pastor familiar with the family, and Timothy both verified C.V.'s claim; in fact, Hunter told Deputy Johnston that C.V.'s "home life is very toxic," as Odalis controls the entire household, and Timothy indicated that Odalis "controls him as well and doesn't allow him to interject as being a parent." Timothy and Hunter also advised that due to C.V.'s errant behavior, Odalis was forcing C.V. to sleep on the floor upstairs so she could "keep a closer eye on him."

Later, during an interview with hospital staff, C.V. further alleged that Odalis disciplines him by spanking him with a "metal paddle on his butt." When Deputy

3

Johnston asked C.V. why he had not informed him of this fact earlier, C.V. indicated that while Odalis and Timothy keep the paddle hidden, which had led him to believe they knew it was wrong to strike their children with it, he did not mention the abuse because Odalis and Timothy told him not to say anything. C.V. then informed Deputy Johnston that he still had bruising from his last spanking. C.V. agreed to show Deputy Johnston the bruising. The two of them went into a bathroom where the deputy observed C.V. He stated later, "I saw that on the right side of his rear there was—it looked like an older bruise. It didn't look recent. It looked like it was just a healing bruise on the right side." Deputy Johnston acknowledged, however, that while the bruising appeared consistent with C.V.'s claims, circumstances other than a spanking could have caused his bruising. Similar to C.V.'s bread and water allegation, Odalis subsequently confirmed that she disciplines her children, with the exception of the younger ones, by spanking them in a "'reasonable manner'" with a paddle known as "the rod."

After C.V.'s evaluation at Stormont-Vail West was complete, the deputy drove C.V. to the Juvenile Intake and Assessment Center. In addition to detailing C.V.'s allegations and history, the Juvenile Intake officer indicated that C.V. had a "larger agenda" that he was not willing, at that time, to fully disclose:

> "This intake officer believes [C.V.] has a larger agenda but he was not willing to disclose that tonight. He wants to go to public school and have peers for friends. He wants to be able to go to pornographic sites and talk on the phone and he wants to try to locate his birth father."

Because the Shawnee County Sheriff's Office determined that C.V. would not be in imminent danger if he was returned home and the Juvenile Intake officer ultimately found that there were "many things about [C.V.'s] situation that could be fixed, changed or negotiated differently but not [that evening]," the Juvenile Intake Center released C.V. to Odalis' custody.

4

The Kansas Department for Children and Families launched a physical abuse investigation concerning Odalis. During that investigation, the agency decided that it was appropriate to conduct a lack of supervision investigation as well. Brenda Henry, the social work specialist assigned to both investigations, interviewed Odalis, Timothy, and 9 of their 10 children (the youngest child was too young to talk). During his interview, C.V. claimed that he was unhappy with the conditions at home, he was struggling with accepting some of the family's religious practices, and he wanted to attend public school and have a social life. C.V. ultimately decided to run away because Odalis was "praying that if he did not straighten up that god would in some way take his life or he would leave." C.V. also told Henry that Odalis' preferred method of discipline is "'beating with the rod,'" and he claimed that he still had bruising on his buttocks from his last spanking. C.V. refused, however, to show Henry the bruising because "the officer saw it and he did not really want [Henry] to look." C.V. then explained that when he and his siblings receive a spanking, they must pull their pants down or lift their skirts up, but they leave on their underwear. While they generally receive 20 swats, Odalis administers "[m]ore swats if [they] clentch [*sic*] [their] fist as this shows [they] are being resistive and more if [they] don't cry as [they] are not accepting the correction." Moreover, C.V. indicated that Odalis will strike the older children on "the side or back of thighs . . . as it hurts more."

When Henry interviewed Timothy, he informed her that while he and Odalis use the rod for discipline, he, unlike Odalis, does not have the children lift their skirts or pull down their pants because he believes in modesty. Timothy then claimed that while he believed the "discipline is beyond agency approval . . . but is not abuse." Timothy further explained that he thought law enforcement would not work a missing person report for at least 24 to 48 hours, and after C.V. had been gone for over 48 hours, he asked Odalis whether she was going to make such a report. When Odalis merely replied "maybe in another day or so," Timothy contacted law enforcement.

Henry also interviewed Odalis and, according to Henry, she made several comments about her use of the rod:

> "She did admit that she does use the rod. That using the hand is for love. That using the rod is for discipline. They did make several comments about using the rod for discipline in the sense of the agency may not approve of that. She did say that sometimes she may spank too hard. Sometimes there may be a mark, but she didn't know of any marks that the children [had]."

Henry further explained that while she did not specifically question Odalis as to the attempts she made to locate C.V. after he ran away, she indicated that Odalis never volunteered any information about such attempts.

About a month later, Henry labeled the allegations of physical abuse and lack of supervision of C.V. by Odalis as "substantiated." She did so because C.V. sustained injuries from being disciplined with the rod/paddle and Odalis never reported him as a runaway. Henry determined that the concerns regarding Odalis' other nine children were "unsubstantiated."

Odalis requested an evidentiary hearing with the Kansas Department of Administration Office of Administrative Hearings. The hearing was held in September 2011.

After hearing the testimony, the parties' arguments, and reviewing the admitted exhibits, the presiding officer entered an order finding that the Department had established by clear and convincing evidence that Odalis abused and failed to appropriately supervise C.V.

6

The presiding officer detailed his findings:

"4.    The child abuse definition at K.A.R. 30-46-10(k) requires two, separate and distinct, findings before one's name can be added to the [DCF] central child abuse and neglect registry. First, there must be a finding by clear and convincing evidence that an act of child abuse or neglect has occurred. Second, [DCF] must show by clear and convincing evidence that the person who abused or neglected a child 'should not be permitted to reside, work, or regularly volunteer in a child care facility.'

"5.    [DCF] has clearly met its burden regarding the first prong of the child abuse and neglect definition. C.V.'s testimony that his mother caused bruises, which were witnessed by Deputy Johnston, is credible and convincing. [Odalis'] denials are not. Likewise, not reporting one's then 15 year old son as a runaway is neglect. The evidence strongly suggested that [Odalis] had no plans to ever report C.V. as a runaway.

"6.    The second prong of the child neglect definition was added in July 2009. It is a purely subjective standard:  whether [Odalis] should be permitted to reside, work or volunteer in a child care setting. Based on [Odalis'] behavior in this matter, this presiding officer believes she should not be permitted to work in a child care setting."

Odalis asked for a rehearing. This request was denied. She then exhausted her administrative remedies when the State Appeals Committee affirmed the findings of fact and law set out in the presiding officer's order.

Odalis then sought judicial review.

*This case came briefly to the Court of Appeals before this occasion.*

Odalis filed her petition for judicial review in December 2012. Highly summarized, she contended that there was not sufficient evidence to prove that she neglected or abused C.V. In her view, the witnesses were not credible. The agency action was unreasonable, and, finally, taking her name off the child abuse and neglect central

7

registry was the right thing to do. The agency answered and contended her petition was untimely.

The district court ruled that Odalis' petition was timely but denied it on the merits because there was ample evidence to support the agency's finding. Unfortunately, the agency had neglected to file the official agency record in the district court before it rendered its judgment. When this was brought to this court's attention, we stayed the briefing and remanded the case to the district court for further proceedings.

Back in district court, this time with the complete official agency record on file, the district court once again denied Odalis any relief. Odalis then brought the matter back to this court asking us to reverse the district court's order.

Odalis raises three issues. Of these, we will deal with two summarily. First, Odalis contends that the district court erred in not entering default judgment in her favor due to the agency's failure to file its answer to her petition for judicial review in a timely manner. K.S.A. 2014 Supp. 77-614(d) makes the filing of a responsive pleading to a petition for judicial review permissive, not mandatory. Thus, the agency's failure to timely file an answer does not, in and of itself, entitle Odalis to a default judgment since it was not required by law to file any answer.

Next, Odalis challenges the district court's decision to affirm the agency's action without the benefit of the official agency record. This issue is now moot because the error was rectified on remand. See *State v. Montgomery*, 295 Kan. 837, 840-41, 286 P.3d 866 (2012).

We move to the third issue. Does the evidence support the agency's finding? Odalis says no. The agency says yes. But before we go into detail, a brief review of the law that guides us is helpful at this point.

8

The Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*, governs appellate review of a state agency's decision. On appeal, the burden of proving the invalidity of the agency action rests on Odalis, as she is the party asserting such invalidity. See K.S.A. 2014 Supp. 77-621(a)(1); *Milano's Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 500, 293 P.3d 707 (2013).

Under the Act, an appellate court reviews a challenge to an administrative agency's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial competent evidence, and whether such evidence exists is a question of law subject to de novo review. See K.S.A. 2014 Supp. 77-621(c)(7), (d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 182-83, 239 P.3d 66 (2010).

Although not statutorily defined, substantial evidence furnishes a basis of fact from which an issue can be resolved reasonably. *L.E.H. v. Kansas Dept. of SRS*, 44 Kan. App. 2d 798, 802, 241 P.3d 167 (2010). Furthermore, K.S.A. 2014 Supp. 77-621(d) defines "'in light of the record as a whole'" as to judge the question in the light of all of the relevant evidence in the record:

> "For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

9

In other words, the statutory definition includes the evidence both supporting and detracting from an agency's finding. Courts must determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the relevant evidence in the record. K.S.A. 2014 Supp. 77-621(d); *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013).

*We look at what is required of the Department when making findings of this type.*

It is the Kansas Department for Children and Families' legal responsibility to not only receive but to investigate reports of child abuse or neglect, assess the validity of each report, and decide if any action is required to protect the child. K.S.A. 2010 Supp. 38-2226(a). If the Department by clear and convincing evidence validates that a person committed an act of abuse or neglect, that person's name will be placed on the agency's child abuse and neglect central registry. See K.A.R. 30-46-10(k) (2011 Supp.); K.A.R. 30-46-15; K.A.R. 30-46-16. Clear and convincing evidence is an intermediate standard of proof between preponderance of the evidence and beyond a reasonable doubt; it means that the truth of the facts asserted is highly probable. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008).

Whether abuse or neglect occurred is determined under the statutes and regulations in effect at the time the acts allegedly took place. See *L.E.H.*, 44 Kan. App. 2d at 802. During the period at issue, abuse included "'[p]hysical, mental or emotional abuse,'" defined as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional wellbeing is endangered." K.S.A. 2010 Supp. 38-2202(y); see K.A.R. 30-46-10(a) (2011 Supp.). Neglect, on the other hand, "means acts or omissions by a parent . . . resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian." K.S.A. 2010 Supp.

38-2202(t); see K.A.R. 30-46-10(i) (2011 Supp.). Neglect may include acts or omissions concerning a child's health, safety, and living conditions:

> "(1) Failure to provide the child with food, clothing or shelter necessary to sustain the life or health of the child;
> "(2) failure to provide adequate supervision of a child or to remove a child from a situation which requires judgment or actions beyond the child's level of maturity, physical condition or mental abilities and that results in bodily injury or a likelihood of harm to the child; or
> "(3) failure to use resources available to treat a diagnosed medical condition if such treatment will make a child substantially more comfortable, reduce pain and suffering, or correct or substantially diminish a crippling condition from worsening. A parent legitimately practicing religious beliefs who does not provide specified medical treatment for a child because of religious beliefs shall not for that reason be considered a negligent parent; however, this exception shall not preclude a court from entering an order pursuant to subsection (a)(2) of K.S.A. 2010 Supp. 38-2217, and amendments thereto." K.S.A. 2010 Supp. 38-2202(t).

*Substantial competent evidence supports the agency findings here.*

In the agency's view, Odalis abused and neglected C.V. by employing excessive corporal punishment and failing to remove him from a situation which required judgment or actions beyond his level of maturity, physical condition, or mental abilities. In particular, C.V. testified that Odalis spanked him on his bottom and thighs with "a hard plastic" paddle, and he alleged that he often had bruising and/or bleeding from the spankings as Odalis would strike him with "all the force she could put into her arm swing."

Deputy Johnston observed bruising on the right side of C.V.'s bottom, and C.V. claimed that a recent spanking caused the bruising. Odalis acknowledged that she "used a rod, which is similar to a paddle, for corporal punishment and physical discipline of

11

[C.V.]" and admitted that she spanks her children "on the buttocks and occaisionally [*sic*] right below the buttocks." While Odalis claimed that she only used the rod "for discipline in a very . . . reasonable manner," Henry testified that Odalis and/or Timothy made several comments indicating that the agency may not approve of their use of the rod and Odalis admitted that "sometimes she may spank too hard. Sometimes there may be a mark." Likewise, Odalis did not personally report C.V. as a runaway and, according to Henry, Timothy told her that when he approached Odalis about filing such a report approximately 2 days later, Odalis merely replied "maybe in another day or so." Plus, when Deputy Cochran asked Odalis to sign a missing person form Odalis stated "several times she did not believe her son was missing and the 'good lord knows where he's at and he's fine.'"

There is some evidence that suggests that C.V.'s allegations may not be entirely credible. For example, C.V.'s history of felonious behavior and the Juvenile Intake officer's observation that C.V. potentially had a "larger agenda" due to his desires to attend public school, maintain an active social life, and enjoy modern technology. But we do not reweigh evidence or engage in de novo review when reviewing an agency's factual findings. See K.S.A. 2014 Supp. 77-621(d).

Odalis suffers from similar credibility problems. For instance, Odalis initially claimed that she only used the rod in a "reasonable manner," then she indicated that she may occasionally spank her children too hard and leave marks upon them, and later, at the hearing, she returned to her "reasonable manner" stance and emphatically denied bruising her children. Moreover, Henry testified that although she did not specifically question Odalis as to the attempts she made to locate C.V. after he ran away, Odalis never volunteered any information about such attempts; yet, at the hearing, Odalis maintained that she did make such an effort.

12

Odalis places great weight upon the outcome of child in need of care proceedings the State filed on behalf of all of her children. The evidence is not helpful. The transcript from the proceeding, which Odalis had added to the record on appeal, indicates that although the judge dismissed the petition for temporary custody of C.V.'s half-brothers and sisters on evidentiary grounds, he dismissed the petition concerning C.V. on the technical ground that a hearing was not held within 30 days. The petition concerning C.V. was not dismissed for lack of evidence. The outcome of the proceeding offers nothing pertinent to our inquiry here.

When we view this action in the light of the record as a whole, substantial competent evidence supports the agency findings of abuse and neglect.

Affirmed.